*JUDGE FRANK MONTALVO*

*FILED
2007 MAR 14 PM 12: 26

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
        DEPUTY*

*№ 344794
& 5-00*

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

CESAR ROBERTO FIERRO,    )
           )
  **Petitioner,**       )
           )
    **v.**         )   No. _____
           )
NATHANIEL QUARTERMAN,    )
**Director, Texas Department of**    )
**Criminal Justice, Correctional**    )
**Institutions Division,**      )
           )
  **Respondent.**      )
           )

## EP07CA0093

## PETITION FOR WRIT OF HABEAS CORPUS

### (CAPITAL CASE)

**RICHARD H. BURR**
Tx. Bar No. 24001005
412 Main Street. Suite 1100
Houston, Texas 77002
(713) 628-3391
(713) 893-2500 (fax)

**JOSEPH SPENCER**
Tx. Bar No. 18921800
1112 Montana
El Paso, Texas 79902
(915) 532-5562

**DAVID R. DOW**
Tx. Bar No. 06064900
University of Houston
 Law Center
100 Law Center
Houston, Texas 77204
(713) 743-2171
(713) 743-2131 (fax)

**Counsel for Applicant**

## TABLE OF CONTENTS

I.   THE CONTEXT IN WHICH THE CLAIM HEREIN IS PRESENTED .........1

II.  SUMMARY OF THE CLAIM PRESENTED HEREIN ......................2

III. JURISDICTION, VENUE, AND TIMELINESS ...........................5

IV.  STATEMENT OF THE CASE AND MATERIAL FACTS ...................7

    A.   The Homicide Investigation, the Trial, and the Initial Habeas Corpus Proceedings ........................................................7

    B.   1994 State Habeas Corpus Proceedings ...............................9

    C.   Subsequent Federal Habeas Proceedings ...........................12

    D.   Vienna Convention Violation .......................................12

    E.   The *Avena* Case in the International Court of Justice .................16

    F.   The Supreme Court's Initial Review of the Questions Presented by the *Avena* Judgment .................................18

    G.   Proceedings in the Texas Court of Criminal Appeals on the *Avena* and Presidential Determination Claim .................................20

V.   STANDARD OF REVIEW ...........................................22

VI.  GROUND FOR RELIEF ..............................................23

    A.   The Texas Courts Are Required To Provide Mr. Fierro Review And Reconsideration As Mandated By The President's Determination And The *Avena* Judgment .................................................23

        1.   Under the President's Determination, Texas Is Required to Provide the Review and Reconsideration Mandated by the *Avena* Judgment in Mr. Fierro's Case ...............................23

        2.   Even Without the President's Determination, the Vienna Convention, As Adjudicated in *Avena*, Is Directly Binding in Mr. Fierro's Case .................................................27

            a.   By the Process Set Forth in the Constitution, the United States Voluntarily Agreed to the Vienna Convention

and Its Optional Protocol .............................. 27

      **b.**    **By Entering into the Vienna Convention and Its Optional Protocol, the United States Agreed to Submit Disputes Arising Under the Convention to the International Court of Justice for Binding Resolution** ...... 30

      **c.**    **Under the *Avena* Judgment, Texas Is Prohibited From Applying Any Procedural Bar to Preclude Review and Reconsideration of Mr. Fierro's Conviction and Sentence** ............................................ 33

**B.**    **Mr. Fierro Has Shown Sufficient Prejudice from the Denial of His Vienna Convention Rights to Require the Texas Courts to Adjudicate His Claim** ...................................................... 34

    **1.**    **The Violation of the Vienna Convention Caused Mr. Fierro Substantial Prejudice That Demands A New Trial** .............. 34

      **a.**    **Mr. Fierro Did Not Know He Had a Right to Contact His Consulate for Assistance** .......................... 35

      **b.**    **Mr. Fierro Would Have Contacted The Mexican Consulate Had He Been Apprised of His Rights** .......... 35

      **c.**    **Mexico Would Have Provided Substantial Assistance to Mr. Fierro** ........................................ 36

    **2.**    **Under the Court of Criminal Appeals' 1996 Decision in Fierro's Case, It Is Apparent That The Violation of the Vienna Convention Caused Fierro the Kind of Prejudice That Demands A New Trial** ........................................... 38

**PRAYER FOR RELIEF** ...................................... 40

**VERIFICATION** ........................................... 41

**CERTIFICATE OF SERVICE** ................................ 42

## EXHIBITS

1    Order of the United States Court of Appeals for the Fifth Circuit

2    *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America)*, 2004 I.C.J. 128 (Mar. 31, 2004)

3    Determination by President George Bush, February 28, 2005

4    *Ex Parte Cesar Roberto Fierro, et al.*, No. 17,425-05, et al. (March 7, 2006)

5    El Paso Police Department booking records of Cesar Fierro

6    Affidavit of Cesar Fierro

7    Affidavit of Juan Manuel Gallastegui

8    Affidavit of Francisco Molina Ruiz

9    Brief for the United States as *Amicus Curiae* in *Medellin v. Dretke*, No. 04-5928 (Supreme Court of the United States)

10   *Torres v. Oklahoma*, No. PCD-04-442 (Okla.Crim.App. 2004)

11   Affidavit of Scott Atlas

12   Affidavit of Michael Iaria

13   Affidavit of Bonnie Lee Goldstein

14   Declaration of Peter Lopez

15   Affidavit of Everard Kidder Meade

Petitioner CESAR ROBERTO FIERRO, by counsel, asks this Honorable Court to issue a writ of habeas corpus and grant him relief from his illegal and unconstitutional conviction for capital murder and sentence of death.

## I. THE CONTEXT IN WHICH THE CLAIM HEREIN IS PRESENTED

Cesar Fierro, a citizen of Mexico, has been confined to death row for twenty-seven years for the 1979 murder of an El Paso taxi driver, Nicolas Castanon. No physical evidence of any kind has ever linked Fierro to the crime. The capital murder conviction rests entirely on a confession by Fierro – found in state habeas proceedings in 1994 to have been coerced – and the uncorroborated testimony of Gerardo Olague, a mentally unstable juvenile delinquent.

In the state habeas corpus hearing in 1994, the trial court found, on the basis of newly-uncovered evidence, that the lead investigating officer, El Paso Police Detective Al Medrano, conspired with the police in Juarez, Mexico, to coerce Fierro's confession. The Texas Court of Criminal Appeals endorsed this determination. *See Ex parte Fierro*, 934 S.W.2d 370, 371-372 (Tex. Crim. App. 1996), *cert. denied*, 521 U.S. 1122 (1997). Notwithstanding the coercion of the confession, the Court of Criminal Appeals held that the admission of the confession was harmless under a state law test that required Fierro to prove that the admission of his confession more likely than not changed the outcome of his trial. 934 S.W.2d at 375-376.[1]

In the same state habeas application in 1994 in which Mr. Fierro mounted the new challenge to his confession, he also argued that the failure of Texas law enforcement officers to

---

[1] In authorizing Mr. Fierro to file a successive federal habeas petition thereafter, the United States Court of Appeals for the Fifth Circuit held that Fierro "made a prima facie showing" that his confession was coerced and that – in sharp disagreement with the Court of Criminal Appeals – had the confession been suppressed, "no reasonable fact-finder would have found him guilty of the underlying offense." Order of November 11, 1997 [attached hereto as Exhibit 1, at page 2-3]. Relief was denied in subsequent proceedings in the United States District Court and the Fifth Circuit, however, solely on the basis of procedural grounds peculiar to the application of the statute of limitations for federal habeas proceedings. *See Fierro v. Cockrell*, 294 F.3d 674 (5th Cir. 2002).

inform him of his right under the Vienna Convention on Consular Relations [hereafter, "Vienna Convention"] to confer with Mexican consular officials violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. Specifically, Fierro argued that, had he been informed of his Vienna Convention rights, he would have consulted with the Mexican consulate and the consulate would have taken steps to eliminate or expose the factors that coerced him to confess. This claim was denied initially by the trial court, as were the coerced confession claims. On review by the Court of Criminal Appeals, the court decided that the trial court erred in denying the confession claims without a hearing and sent Fierro's case back to the trial court for a hearing. However, the court sustained the trial court's summary denial of the Vienna Convention claim.

## II.    SUMMARY OF THE CLAIM PRESENTED HEREIN

In this petition, Mr. Fierro raises a single claim related to, but distinct from, the Vienna Convention claim he raised before the state courts in 1994:

(a)    Because of a binding 2004 judgment of the International Court of Justice [hereafter, "ICJ"], which determined that Mr. Fierro and others had been denied their rights under the Vienna Convention, and

(b)    a subsequent determination by President Bush on February 28, 2005, that Mr. Fierro and the others whose Vienna Convention rights were adjudicated by the ICJ have a right to review of the merits of their Vienna Convention claims in the state courts without regard to state procedural rules that might otherwise bar review,

(c)    Mr. Fierro has a federally enforceable right to review and reconsideration of his conviction and sentence in the Texas courts in light of the violation of his rights under the Vienna Convention, which has been violated by the Texas Court of Criminal Appeals' refusal to

undertake such review.

The elements of this claim have arisen as follows:

● On March 31, 2004, the International Court of Justice decided in Mexico's favor a case brought by Mexico against the United States for violations of the Vienna Convention – a treaty to which the United States and Mexico are both parties – with respect to 52 Mexican citizens sentenced to death in the United States. *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America)*, 2004 I.C.J. 128 (Mar. 31, 2004) [hereafter, "*Avena* Judgment"]. The decision is attached hereto as Exhibit 2. Mr. Fierro was one of the 52 Mexican citizens whose rights were determined by the decision. The ICJ held that his rights to consular notification and consultation were denied, *id.* at ¶¶ 106(1), 153(4) and that Mexico's right to notification of Fierro's detention, to have access to and communicate with Fierro, and to arrange for his representation were denied. *Id.* at ¶¶ 106(2)-(4). The ICJ also decided with respect to Fierro that the United States was in violation of its duty under the Vienna Convention to permit judicial review of the merits of his Vienna Convention claim, because his conviction and sentence were final and the operation of various procedural default doctrines in the United States courts precluded any review of the merits of Fierro's Vienna Convention claim. *Id.* at ¶¶ 114, 153(8). For this reason, the ICJ ordered the United States "to find an appropriate remedy" that would permit meaningful review of the merits of Fierro's Vienna Convention claim. *Id.* at ¶ 152.

● On February 28, 2005, President Bush determined that the state courts must provide review and reconsideration of the merits of the Vienna Convention claims of the individual Mexican citizens involved in *Avena*, in keeping with the criteria set forth in the *Avena* decision, notwithstanding any state procedural rules that might otherwise bar merits review of

3

his claim. President Bush issued the following statement:

> I have determined, pursuant to the authority vested in me as President by the Constitution and laws of the United States of America, that the United States will discharge its international obligations under the decision of the International Court of Justice in the *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America (Avena)*, 2004 I.C.J. 128 (Mar. 31), by having state courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision.

Exhibit 3 [attached hereto].

- On March 7, 2007, the Texas Court of Criminal Appeals determined that the *Avena* judgment and the presidential determination did not require review and reconsideration of Mr. Fierro's conviction and death sentence. *Ex Parte Cesar Roberto Fierro, et al.*, No. 17,425-05, et al. (Exhibit 4 [attached hereto]). On the basis of its decision in another *Avena* individual party's case, *Ex parte Medellín*, 2006 WL 3302639 (Tex. Crim. App. Nov. 15, 2006) (to be published in S.W.3d) – that the presidential determination did not constitute preemptive federal law that would overcome Texas procedural rules preventing merits review of a Vienna Convention claim made by an *Avena* individual party, and that the *Avena* judgment was not binding – the CCA dismissed Mr. Fierro's petition as failing to satisfy the procedural requirements necessary to gain review of his conviction and sentence in a subsequent habeas application.

The present petition raises two inextricably-linked grounds, which were presented to and rejected by the Texas Court of Criminal Appeals:

First, whether the determination of the President of the United States, issued February 28, 2005, that the United States would comply with its international obligation to comply with the *Avena* judgment, is a valid exercise of his constitutional and statutory foreign affairs authority,

and preempts any state law that is inconsistent with it or would interfere with the achievement of its purpose.

Second, whether the ICJ's judgment in *Avena* directly adjudicating the rights of Mr. Fierro and 51 other Mexican nationals by name, is binding in Mr. Fierro's case as a matter of treaty and other federal law, and required the Texas courts to give "review and reconsideration" to Mr. Fierro's conviction and sentence.

In presenting the claim herein, Mr. Fierro is not asserting in this petition that the Vienna Convention itself, independent of the *Avena* judgment and the President's determination, requires review and reconsideration of his conviction. *See Sanchez-Llamas v. Oregon*, ___ U.S. ___, 126 S. Ct. 2669 (2006) (interpreting the Vienna Convention not to trump state-law procedural default rules). Rather, Mr. Fierro relies on the binding effect of the *Avena* judgment and the President's determination that the obligations under the *Avena* judgment must be given effect.

Both the President's determination and the *Avena* judgment make explicit that procedural default rules cannot be applied to bar review and reconsideration of the convictions and sentences of the 52 named Mexican nationals, including Mr. Fierro, to determine if they were affected by the Vienna Convention violations in their cases. For these reasons, Mr. Fierro requests that his conviction and sentence be set aside unless the courts of Texas grant him, within a reasonable time to be determined by this Court, the review and reconsideration to which he is entitled under the *Avena* judgment and the President's determination.

## III. JURISDICTION, VENUE, AND TIMELINESS

This court has personal jurisdiction and venue is proper under 28 U.S.C. § 2241(d), because Mr. Fierro was convicted in the 120th Judicial District Court of El Paso County, Texas,

located within the Western District of Texas, and is confined in Texas. The court has subject

matter jurisdiction under 28 U.S.C. §§ 1331, 2241, and 2254.

Mr. Fierro's instant application is timely filed under 28 U.S.C. § 2244(d) as it is filed

within one year of the *Avena* Judgment (March 31, 2004) and the President's determination

granting Mr. Fierro a federal right to the remedy mandated by the ICJ in *Avena* (February 28,

2005), after properly excluding the period during which Mr. Fierro's petition for collateral

review was pending in state court (from March 23, 2005, to March 7, 2007). *See* 28 U.S.C.

§ 2244(d)(1)(D), (d)(2).

All grounds for relief have been raised in the highest state court having jurisdiction.

Petitioner currently has no petition or appeal pending in any other court. However, he does

intend to file a petition for writ of certiorari in the Supreme Court of the United States requesting

review of the Court of Criminal Appeals' decision of March 7, 2006. By separate motion, Mr.

Fierro seeks an order staying consideration of the instant habeas petition during the pendency of

that proceeding in the Supreme Court. Petitioner has no future sentence to serve if the

conviction and sentence are set aside.

This is not a "second or successive habeas corpus application" within the meaning of 28

U.S.C. § 2244(b) because the grounds asserted herein were premature, unripe, and did not exist

at the time of filing of Mr. Fierro's previous habeas corpus petition, which was filed and

adjudicated before the *Avena* judgment and the Presidential determination were issued.

Accordingly, under *Slack v. McDaniel*, 529 U.S. 473, 485-86 (2000), and *Stewart v. Martinez-*

*Villareal*, 523 U.S. 637, 643-44 (1998), the claim presented herein cannot be considered as

successive. *See also Medellin v. Dretke*, 544 U.S. 660, 666 (2005) (deciding that federal

adjudication of petitioner's claim based on the *Avena* judgment and President Bush's

determination was premature, and dismissing certiorari so that the claim could be addressed by
the Texas courts in the first instance).

## IV.   STATEMENT OF THE CASE AND MATERIAL FACTS

### A.   The Homicide Investigation, the Trial, and the Initial Habeas Corpus Proceedings

From the outset Fierro maintained that he was innocent, and that the confession was
coerced. *See* S.R. Vol. I, 135, 165-168; S.R. Vol. II, 1295-1301.[2]  Fierro did not become a
suspect in the murder of taxi driver Nicolas Castanon until over four months later, when sixteen-
year old Gerardo Olague came into contact with the El Paso Police. S.R. Vol. II, 1207. Two
other men, whom eyewitnesses identified as having abandoned Castanon's blood-stained taxi in
a Juarez neighborhood the same morning his body was found in an El Paso park, were suspects
in the murder and were in custody at the time. S.R. Vol. I, 1110; S.R. Vol. II, 1183, 1308-1311.
One of the eyewitnesses who identified these two men testified at Fierro's trial that Fierro did
not resemble either of them. S.R. Vol. II, 1308-1309, 1408.

On July 31, 1979, Detective Medrano advised the First Assistant District Attorney, Gary
Weiser, that Olague had implicated Fierro in the murder. S.R. Vol. I, 141-142.  Olague
reportedly told the police that he believed Fierro was living in Juarez, but he did not know the
address. S.R. Vol. I, 141-142.  Weiser told Medrano he thought he had seen Fierro's name on
the El Paso Jail log, and suggested that Medrano look for Fierro at the jail. *Id.* Instead of going
to the El Paso jail, where Fierro was in fact incarcerated for a probation violation due to
possession of marijuana, S.R. Vol. I, 110-111, Medrano went to Mexico for a series of meetings

---

[2]References to the state trial record are to "S.R." followed by the volume and page number(s) within that
volume.

7

with Juarez Police Comandante Jorge Palacios. S.R. Vol. I, 100-108. Medrano testified at a hearing on Fierro's subsequent motion to suppress the confession that these meetings were strictly for purposes of locating Cesar Fierro. S.R. Vol. I, 100.

In the pre-dawn hours of August 1, 1979, the Juarez Police — notorious at the time for the widespread use of torture — led an abusive and illegal raid on the home of Fierro's mother and step-father, seized letters that were written by Fierro and his brother, abducted the parents, and transported them to the Juarez jail. S.R. Vol. I, 151-157, 160-162. At the jail, the Juarez Police physically abused Fierro's mother and threatened his step-father with a "chicharra" — an electric cattle prod that attaches to the genitals. S.R. Vol. I, 158-159, 160-161; S.R. Vol. II, 1326-27. Fierro's parents were released from custody, without being charged, after a Juarez Police officer told them "Cesar had confessed[.]" S.R. Vol. I, 151-157, 160-162.

At the same time the Juarez Police were holding Fierro's parents, Medrano interrogated Fierro at the El Paso Jail. Fierro testified at the suppression hearing that Medrano told him that the Juarez Police had taken his parents into custody and would not release them unless he confessed. S.R. Vol. I, 166-167. According to Fierro, Medrano convinced him that the Juarez Police had captured his parents by displaying letters he and his brother had written to their parents. *Id.*

To counter these allegations, the State relied on the suppression hearing testimony of Medrano, who insisted he did not know, much less tell Fierro, that the Juarez Police had taken his parents into custody. S.R. Vol. I, 120-123. Medrano also denied receiving or knowing anything about the letters that Fierro's mother stated the Juarez Police seized during the raid, and that Fierro claimed Medrano utilized as a coercive device during the interrogation. S.R. Vol. I, 131-132. The trial judge rejected Fierro's coerced confession claim after finding that Medrano's

8

testimony was truthful, and admitted the confession.

The State relied on the confession as the centerpiece of its case against Fierro. During the closing argument at the guilt/innocence phase of the trial, the prosecutor encouraged the jury to bring the English and Spanish versions of the confession into the jury room, S.R. Vol. II, 1419, and argued that Fierro could be convicted on the basis of the confession alone, even if Olague's testimony was rejected in its entirety. *Id.* The jury convicted Cesar Fierro of capital murder and sentenced him to death in 1980.

In deference to the trial court's finding that Medrano's testimony at the suppression hearing was truthful, Fierro's coerced confession claim was denied on direct appeal and in subsequent federal habeas corpus proceedings. *See Texas v. Fierro*, 706 S.W.2d 310, 316 (Tex. Crim. App. 1986); *Fierro v. Lynaugh*, 879 F.2d 1276 (5th Cir. 1989), *cert. denied*, 494 U.S. 1060 (1990). Fierro raised a constitutional challenge to the Texas capital sentencing scheme in post-conviction and habeas corpus proceedings brought in 1990, but did not include a coerced confession claim, since he had not yet discovered any new evidence to overcome the presumption of correctness accorded to the trial court's finding that Medrano's testimony at the suppression hearing was truthful.

**B.      1994 State Habeas Corpus Proceedings**

In 1994, Fierro's attorneys discovered new evidence indicating that Medrano's testimony at the suppression hearing was perjurious. The critical evidence was a previously undiscovered police report that was dictated by Medrano in the hours leading to the interrogation. According to the report, Comandante Palacios telephoned Medrano at 5:00 that morning to advise that the Juarez Police "had custody" of Fierro's mother and his step-father. The report directly conflicted with Medrano's testimony at the suppression hearing and at trial, during which he

9

insisted, "in front of this Court" that "Mr. Palacios never told" him that the Juarez Police had taken Fierro's parents into custody. S.R. Vol. I, 120-121; S.R. Vol. II, 1173 In light of this and other evidence that was appended to a state habeas corpus application filed in 1994, the Court of Criminal Appeals ordered an evidentiary hearing on Fierro's claims that his due process rights were violated by Medrano's perjured testimony.

In addition to receiving voluminous documentary exhibits and hearing the live testimony of sixteen witnesses, the state habeas judge secured through a letter rogatory the testimony of Palacios, who was residing in Mexico. Assistance from the Mexican Government was critical to obtaining a statement from Palacios, who refused to give a voluntary statement or to testify in the United States.

Palacios's letter rogatory testimony contradicted Medrano's testimony at the suppression hearing in several key respects — most importantly, concerning the purpose for Medrano meeting Palacios in the early morning hours preceding the interrogation. See S.R. Vol. I, 106-107, 119. According to Medrano's suppression hearing testimony, Palacios telephoned him at 5:00 A.M. on August 1, 1979, to report that he had ascertained Cesar Fierro's whereabouts. Medrano testified that Palacios did not disclose Fierro's location over the telephone and wanted to meet for breakfast in Juarez so he could disclose the location in person. S.R. Vol. I, 141-142; S.R. Vol. II, 1159. Medrano insisted that Palacios did not tell him over the telephone that Cesar Fierro was at the El Paso Jail and surmised that Palacios wanted to meet in person to "dramatize" the disclosure. S.F. Vol. II, 1159. According to Medrano's testimony, the letters that Fierro claimed Medrano used to coerce the confession were neither transferred nor discussed during this meeting, nor at any other time. S.R. Vol. I, 108, 131-132.

Contrary to Medrano's testimony at the suppression hearing, Palacios testified in the

10

letter rogatory proceeding that he told Medrano over the telephone, before they met for breakfast in Juarez, that Fierro was incarcerated at the El Paso Jail. S.H. Vol. VI, State's Exh. A, 9.[3] Palacios testified that he ascertained Fierro's whereabouts by examining letters that Fierro's mother produced during his encounter with her that morning. *Id.* at 8-9. Palacios testified that the letters were written by Cesar Fierro and his brother, Sergio, and showed that the brothers were incarcerated under each other's names at different jails in Texas. *Id.* Although Palacios denied in the letter rogatory proceeding that he seized these letters, this testimony was impeached by the testimony of Gustavo De La Rosa Hickerson, an attorney from Juarez who had known Palacios for many years. S.H. Vol. VI, 580-582. According to this testimony, Palacios told De La Rosa that he telephoned Medrano at 5:00 that morning to tell him that Fierro was incarcerated at the El Paso Jail, and to arrange a transfer of the letters he had obtained from Fierro's mother, because the letters established that Fierro was utilizing his brother's name. *Id.* Palacios told De La Rosa that he could not understand why he had been vilified in the media for his role in the investigation, when all he did was provide Medrano with some letters that helped establish Fierro's whereabouts. *Id.*

After considering this and other evidence, the state habeas judge found that Medrano's testimony at the suppression hearing was false, and that the testimony of Fierro and his parents regarding the circumstances surrounding the confession was truthful. Having found that Medrano had conspired with Palacios in the custodial detention of Fierro's parents in order to coerce the confession, the judge recommended that Fierro receive a new trial.

The Court of Criminal Appeals unanimously adopted the habeas judge's fact-findings.

---

[3]"S.H." refers to the record of the 1994 state habeas proceeding.

*Ex parte Fierro*, 934 S.W.2d 370, 371-372 (Tex. Crim. App. 1996). The Court also agreed that

Fierro's "due process rights were violated by Medrano's perjured testimony[,]" *id.*, and even

held that the false testimony was "material" under *Chapman v. California*, 386 U.S. 18 (1967).

In a 5-4 decision, however, the Court held that the due process violation was "harmless error"

and refused to order a new trial. *Fierro*, 934 S.W.2d at 376. Fierro's petition for a writ of

*certiorari* was denied on June 27, 1997. *Fierro v. Texas*, 521 U.S. 1122 (1997).

### C.   Subsequent Federal Habeas Proceedings

Thereafter, on November 11, 1997, the United States Court of Appeals for the Fifth

Circuit authorized Fierro to file a successive federal habeas petition raising the coerced

confession claims. In doing so, the Court *rejected* the Court of Criminal Appeals' conclusion

that the coercion of Fierro's confession would not have changed the outcome of his trial::

> Fierro has made a prima facie showing that his Petition will raise claims based on
> new evidence [of the coercion of his confession and of the falsity of police
> testimony denying coercion] that could not have been previously discovered
> through the exercise of due diligence and that the facts underlying the claims, if
> proved and viewed in the light of the evidence as a whole, would be sufficient to
> establish by clear and convincing evidence that, *but for constitutional error, no
> reasonable fact-finder would have found him guilty of the underlying offense.*

Exhibit 1, at 2-3 (emphasis added). The federal habeas petition was filed in the United States

District Court but then denied because the court deemed the filing not to be timely under the

statute of limitations governing federal habeas petitions. The Fifth Circuit affirmed solely on

this basis – never backing away from its initial determination that admission of the coerced

confession was harmful – *see Fierro v. Cockrell*, 294 F.3d 674 (5th Cir. June 13, 2002) (*as

revised* June 19, 2002), and the Supreme Court denied a writ of certiorari on March 31, 2003.

*Fierro v. Cockrell*, 538 U.S. 947 (2003).

## D.  Vienna Convention Violation

As noted, in the 1994 state habeas application, Mr. Fierro argued that the failure of Texas law enforcement officers to inform him of his right under the Vienna Convention to confer with Mexican consular officials violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The state courts denied relief on this claim without a hearing. The allegations are as compelling today as they were then.

When the police arrested Mr. Fierro, they were well aware that he was a Mexican citizen. According to Medrano and another detective, their only reason for seeking assistance from authorities in Juarez was to find Fierro.[4]  In addition, police booking records listed Mr. Fierro's nationality as "Mexican" and showed his address in Mexico. Exhibit 5 [attached hereto]. Medrano interviewed Fierro primarily in Spanish, advised him of his constitutional rights in Spanish, and took the confession in Spanish. See S.R. Vol. I at 27, 73 (Suppression Hearing). Finally, in response to the prosecutor's questioning at the suppression hearing, Mr. Fierro testified that he was a Mexican national. S.R. Vol. I at 184 (Suppression Hearing). Despite their knowledge of his citizenship, law enforcement authorities failed to advise Mr. Fierro of his rights under the Vienna Convention.[5]

As the United States has long recognized, expeditious notification to an arrestee of his rights under Article 36 of the Vienna Convention is essential to ensuring that a foreigner has his government's protection and assistance as soon as he is confronted with another nation's

---

[4]See S.R. Vol. I at 43, 35, 62, 80, 82, 110, 119, 120 (Suppression Hearing); S.R. Vol. II at 1052, 1158.

[5]See S.R. Vol. I at 26 (Suppression Hearing) (describing magistrate's warning – silent as to rights under Vienna Convention); S.R. Vol. II at 1129 (describing warnings police administered – no mention of Vienna Convention rights).

13

criminal justice system.[6]

> In order for the consular officer to perform the protective function in an efficient and timely manner, it is essential that the consul obtain prompt notification whenever a United States citizen is arrested. Prompt notification is necessary to assure early access to the arrestee. Early access in turn is essential, among other things, to receive any allegations of abuse [and] to provide a list of lawyers and a legal system fact sheet to prisoners.

State Representation, Digest of United States Practice in International Law (1980) § 2, at 360.

Immediate notification of a detainment allows the home consulate to intervene at a crucial point to gather critical information and contact those who are best able to aid the accused. Aid at an early stage of the proceedings is so critical that the United States demands that foreign governments act "as quickly as possible, and in any event, no later than the passage of a few days" to inform our consular officials of an arrest. State Representation, Digest of United States Practice in International Law (1975) § 2, at 249.

The procedures outlined in the Vienna Convention ensure that a detainee's rights are protected through every stage of the foreign legal proceedings and that those proceedings meet standards required by international law. But the home State is dependent upon the detaining State – and its commitment to its duties under international law – to set the procedural safeguards in motion. If the detaining State does not honor its obligation to inform the arrestee of his rights, the home State may never learn of the detainment. The national is left unprotected, caught up in a legal system he does not fully comprehend.

Had he been aware of his right to contact a representative from the Consulate's office,

---

[6]The Vienna Convention expressly states that consular functions include "helping and assisting nationals" and "protecting . . . the interests of the sending State and its nationals." Vienna Convention, art. 5(b) and (e). *See also* Vienna Convention on Diplomatic Relations, 23 U.S.T. 3230 (1961); Luke T. Lee, *Consular Law and Practice* 134 (1991) (protection of and assistance to nationals is a consulate's primary function).

Mr. Fierro would have done so. Exhibit 6 (Affidavit of Cesar Fierro) [attached hereto]. Fear for the well-being of his family in Mexico was the primary reason Fierro would have contacted the Mexican consulate:

> After Medrano and Palacios told me my family was in jail, I would have talked to anyone in the Mexican government who would listen.... I wanted my family out of jail, and I wanted to know the police were not going to torture them.

*Id.* at ¶ 5.

There has never been a dispute that Mr. Fierro feared for his family's safety.[7]

Furthermore, as described above, both the record in Fierro's case and evidence long suppressed by the El Paso police establish that the El Paso and Juarez police informed Mr. Fierro that his parents were in the custody of the Juarez police and would be tortured unless he confessed. The state courts found these facts to be true in the 1994 habeas proceeding.

The Consul General of Mexico in El Paso at the time of Fierro's arrest declared in an affidavit in 1994 that, had Mr. Fierro consulted with him at the time of his arrest, he would have provided the following assistance:

- Explained to him, in Spanish, his legal rights under the criminal justice system of the United States, including his right to a court-appointed lawyer;

- Provided him with a list of Spanish speaking attorneys who could have sought a court appointment to represent Fierro during police questioning; and, most importantly,

- Ascertained whether or not the Juarez police had arrested and detained Fierro's family and done something about the information he learned. If they were in police custody, he could have contacted the Attorney General of the State of Chihuahua to determine if the arrest was legal. If the arrest was not legal, he would have taken steps to gain their release by contacting the Attorney General. If the family was not in custody, he would have conveyed this information to Fierro.

Exhibit 7, ¶¶ 4-7 (Affidavit of Juan Manuel Gallastegui, Consul General) [attached hereto].

---

[7] S.R. Vol. I at 116-18, 120, 123 (Suppression Hearing); S.R. Vol. II at 177.

The Attorney General of the State of Chihuahua declared in an affidavit in 1994 that he would have done the following, had the Consul General asked him to inquire into whether the Juarez police had unlawfully detained the family of a Mexican citizen incarcerated in the United States:

- Personally contacted the Chief of Police to investigate;

- Ordered the family's release, if they were unlawfully detained;

- Advised the Consul General of the results of his inquiry.

Exhibit 8, ¶¶ 3, 4 (Affidavit of Francisco Molina Ruiz, Attorney General of the State of Chihuahua) [attached hereto].

The Vienna Convention was established to furnish exactly the type of assistance which the consulate and the Attorney General would have provided, and which Mr. Fierro desperately needed.

### E.   The *Avena* Case in the International Court of Justice

On January 9, 2003, the Government of Mexico initiated the *Avena* case in the International Court of Justice against the United States, alleging violations of the Vienna Convention in the case of Mr. Fierro specifically, along with the cases of 53 other Mexican nationals who had been sentenced to death in state criminal proceedings in the United States. Mexico sought relief both on its own behalf and, in the exercise of its right of diplomatic protection, on behalf of its nationals, *Avena,* at ¶ 12, specifically including Mr. Fierro by name. *Id.* at ¶ 16(31). The ICJ held a hearing during the week of December 15, 2003, and issued a final judgment on March 31, 2004, expressly adjudicating Mr. Fierro's own rights, as well as those of the other nationals on whose behalf Mexico had sought relief. *Id.* at ¶¶ 40, 106.

In particular, the ICJ held that the United States – acting through various state and local

16

officials – had breached its obligation under Article 36(1)(b) in the case of 51 Mexican nationals, including Mr. Fierro, "to inform detained Mexican nationals of their rights under that paragraph." *Id.* at ¶¶ 106(1), 153(4). In 49 of those cases, again including that of Mr. Fierro, the ICJ also found that the United States breached Article 36(1)(b) when officials failed "to notify the Mexican consular post of the[ir] detention." *Id.* at ¶¶ 106(2), 153(5). In the cases of Mr. Fierro and 48 other Mexican nationals, the ICJ further held that the United States had breached its obligation under Article 36(1)(a) "to enable Mexican consular officers to communicate with and have access to their nationals, as well as its obligation under paragraph 1(c) of that Article regarding the right of consular officers to visit their detained nationals." *Id.* at ¶¶ 106(3), 153(6). In the cases of Mr. Fierro and 33 other Mexican nationals, the ICJ also held that the United States had breached its obligation under Article 36(1)(c) "to enable Mexican consular officers to arrange for legal representation of their nationals." *Id.* at ¶¶ 106(4), 153(7). And finally, in the cases of Mr. Fierro and two other Mexican nationals, the ICJ held that the United States had breached its obligations under Article 36(2) "by not permitting the review and reconsideration, in the light of the rights set forth in the Convention, of [Fierro's] conviction and sentence[]..., after the violations referred to in subparagraph [153](4) above had been established...." *Id.* at ¶ 153(8).

The ICJ then turned to remedies. It held that the United States must provide "review and reconsideration" of the convictions and sentences of Mr. Fierro and the other Mexican nationals in whose cases it found violations. *Avena*, at ¶¶ 14, 121-122, 153(9). The ICJ then specified the nature of the review and reconsideration that the United States would need to provide to Mr. Fierro: *first*, the required review and reconsideration must take place "within the overall judicial proceedings relating to the individual defendant concerned;" *second*, procedural default

17

doctrines could not bar the required review and reconsideration when the competent authorities

of the detaining State had themselves failed in their obligation of notification; *third*, the review

and reconsideration must take account of the Article 36 violation on its own terms and not

require that it qualify also as a violation of some other procedural or constitutional right; and

*finally*, the forum in which the review and reconsideration occurs must be capable of

"examin[ing] the facts, and in particular the prejudice and its causes, taking account of the

violation of the rights set forth in the Convention." *Id.* ¶¶ 111-113, 120-122, 133-134, 138-141.

F.     **The Supreme Court's Initial Review of the Questions Presented by the *Avena*
       Judgment**

On December 10, 2004, the Court granted certiorari in the case of one of the Mexican

nationals included in the *Avena* judgment, Jose Ernesto Medellin, to review two questions

regarding the enforceability of the *Avena* judgment:

> 1.     In a case brought by a Mexican national whose rights were adjudicated in
> the *Avena* Judgment, must a court in the United States apply as the rule of
> decision, notwithstanding any inconsistent United States precedent, the *Avena*
> holding that the United States courts must review and reconsider the national's
> conviction and sentence, without resort to procedural default doctrines?
>
> 2.     In a case brought by a foreign national of a State party to the Vienna
> Convention, should a court in the United States give effect to the *LaGrand* and
> *Avena* Judgments as a matter of international judicial comity and in the interest of
> uniform treaty interpretation?

Petition for Writ of Certiorari, Aug. 18, 2004, 2004 WL 2851246, *Medellin v. Dretke* (U.S.) (No.

04-5928); *see Medellin v. Dretke*, 543 U.S. 1032 (2004) (order granting certiorari).

On February 28, 2005, after certiorari was granted, and while Mr. Medellin's case was

pending before the Supreme Court, President Bush issued a signed, written determination that

state courts must provide review and reconsideration to the 51 Mexican nationals named in the

*Avena* judgment, pursuant to the criteria set forth by the ICJ in the *Avena* judgment,

18

notwithstanding any state procedural rules that might otherwise bar review of the claim on the merits. The President declared:

> I have determined, pursuant to the authority vested in me as President by the Constitution and laws of the United States, that the United States will discharge its international obligations under the decision of the International Court of Justice in the *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America (Avena)*, 2004 I.C.J. 128 (Mar. 31), by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision.

*See* Exhibit 3 [attached hereto].

On March 8, 2005, Mr. Medellin filed a motion in the U.S. Supreme Court, asking it to stay the case before it in deference to the President and hold it in abeyance while Mr. Medellin exhausted his *Avena* claim in the Texas state courts in accordance with the President's determination. By March 24, 2005, Mr. Medellin and a number of other individual Mexican nationals covered by *Avena* – including Mr. Fierro – filed subsequent habeas applications in the Texas courts pursuant to Article 11.071, § 5, of the Texas Criminal Procedure Code, requesting among other forms of relief, an evidentiary hearing on the merits of their claims under the *Avena* judgment and the President's determination.

On May 23, 2005, the Supreme Court dismissed the writ of certiorari "[i]n light of the possibility that the Texas courts will provide Medellin with the review he seeks pursuant to the *Avena* judgment and the President's memorandum, and the potential for review in this Court once the Texas courts have heard and decided Medellin's pending action." *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). The Court based its decision that adjudication was premature on, among other things, the requirement that "Medellin can seek federal habeas relief only on claims that have been exhausted in state court. To gain relief based on the President's memorandum or ICJ judgments, Medellin would have to show that he exhausted all available state-court

remedies." *Id.*

### G. Proceedings in the Texas Court of Criminal Appeals on the *Avena* and Presidential Determination Claim

Following the Supreme Court's dismissal in *Medellín*, which effectively referred the case back to the Texas state courts, the CCA set Mr. Medellín's state petition for briefing and oral argument and took no action in Fierro's case or the other *Avena* individual parties who had filed subsequent habeas applications in the state courts to enforce *Avena* and the presidential determination.

The *Medellín* parties briefed, among other things, whether the treaties requiring the United States to comply with the *Avena* judgment, or the President's determination implementing that judgment, or both, preempted any Texas law that would bar a decision on the merits of his Vienna Convention claim. In particular, Mr. Medellín argued that the *Avena* decision and the President's determination implementing it on his behalf are binding federal law, which preempts the procedural bar against subsequent habeas applications codified in Article 11.071, § 5, of the Texas Criminal Procedure Code, under the Supremacy Clause of United States Constitution. Subsequent Application for Post-Conviction Writ of Habeas Corpus, Mar. 24, 2005, at 13-24, *Ex parte Medellín* (Tex. Crim. App.) (No. AP-75,207). Mr. Medellín also argued that he satisfied the requirements of § 5 in any event. *Id.* at 24-26.

The United States, as *amicus curiae*, argued in support of granting Mr. Medellín review and reconsideration of his conviction and sentence, on the ground that the President determined that such review was necessary for compliance with the United States' international obligations. Brief of United States as Amicus Curiae, Sept. 2, 2005, at 12, *Ex parte Medellín* (Tex. Crim. App.) (No. AP-75,207) [Exhibit 10, attached hereto]. The United States explained that

application of § 5 to bar Mr. Medellin's petition would contravene the President's

implementation of treaty obligations, as authorized by federal statute and his foreign affairs

authority under Article II of the United States Constitution, and that federal law thus preempts

§ 5 in Mr. Medellin's case. *Id.* at 14-15.

The CCA heard oral argument from Mr. Medellin, the State of Texas, and the United

States on September 14, 2005. On November 15, 2006, the court dismissed Mr. Medellin's

application, holding that the application did not satisfy Texas Criminal Procedure Code Article

11.071, § 5, and that *Avena* and the President's determination do not preempt that provision of

state law. *Ex parte Medellin*, 2006 WL 3302639 (Tex. Crim. App. Nov. 15, 2006) (to be

published in S.W.3d).

With respect to the *Avena* judgment, the Texas court held that Mr. Medellin's claim was

foreclosed by *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006), which interpreted the Vienna

Convention in a way inconsistent with the *Avena* judgment. The Texas court failed to realize

that the Supreme Court's *Sanchez-Llamas* decision addressed only the interpretation of the

Vienna Convention itself, not whether the *Avena* judgment—whether right or wrong in the view

of the U.S. courts—was binding in the cases of the 51 Mexican nationals, such as Mr. Medellin,

whose cases the ICJ adjudicated. The two defendants in *Sanchez-Llamas* were not among the

Mexican nationals named in the *Avena* judgment.

With respect to the President's determination, the Court of Criminal Appeals was deeply

divided, with no single rationale commanding a majority. Judge Keasler, joined by Judges

Meyers, Price, and Hervey, was of the view that the President could not achieve the effect he

sought by way of his determination, though he may have power to achieve the same result by an

executive agreement with Mexico. Presiding Judge Keller expressed the view that even an

executive agreement would not be enough because of the state interests involved, and that at least a ratified treaty would be required. Judge Cochran, joined by Judges Johnson and Holcomb, concluded that the President's determination was ineffective because it was not in the form of a Proclamation or Executive Order published in the Federal Register. Judge Womack concurred in the result without opinion.

On January 16, 2007, Mr. Medellin filed a petition for writ of certiorari in the United States Supreme Court. *Medellin v. Texas*, No. 06-984. Respondent's response is due March 22, 2007. *See* www.supremecourtus.gov/docket/06-984.htm.

On March 7, 2007, the Texas Court of Criminal Appeals entered an order dismissing Mr. Fierro's and other *Avena* individual parties' subsequent habeas applications. *Ex Parte Cesar Roberto Fierro, et al.*, No. 17,425-05, et al. (Exhibit __ [attached hereto]). The court cited *Ex parte Medellin*, 2006 WL 3302639 (Tex. Crim. App. Nov. 15, 2006) (to be published in S.W.3d), as the basis for its order that Mr. Fierro's application failed to satisfy the procedural requirements for subsequent habeas applications in Article 11.071, § 5. Accordingly, the order found that Mr. Fierro was procedurally barred from seeking review and reconsideration of his conviction and sentence on the basis of *Avena*, the presidential determination, and the Vienna Convention.

## V. STANDARD OF REVIEW

Since Texas has refused to address Mr. Fierro's claims on their merits despite an ICJ ruling explicitly adjudicating his rights and a presidential determination to carry out that court's holding with respect to Mr. Fierro, this Court is not obligated to defer to the state court's decision, and may review the matter *de novo*. *See* 28 U.S.C. §2254(d). Alternatively, to the extent that any of Mr. Fierro's claims might be regarded as adjudicated on the merits, this Court

22

need not extend deference to those State court proceedings since they involved an unreasonable application of clearly established Federal law regarding the binding effect of treaties and the President's authority to implement treaty obligations.

## VI. GROUND FOR RELIEF

### A. The Texas Courts Are Required To Provide Mr. Fierro Review And Reconsideration As Mandated By The President's Determination And The *Avena* Judgment

The *Avena* judgment, which is binding by treaty, and President Bush's determination constitute two separate sources of federal law. Each of them requires Texas to provide review and reconsideration of Mr. Fierro's conviction and sentence, and expressly precludes the application of any rules of procedural default that would prevent review and reconsideration on the merits. The CCA, however, has read Texas law to inhibit the application of these sources of federal law, and has held the President's determination and the *Avena* judgment to be legally ineffective . In so doing, the CCA has defied the President's direct order as this nation's Head of State to resolve tensions with another nation and inhibited this country's ability to carry out its treaty obligations and protect its citizens abroad. As such, Texas procedural default law must be preempted, and the Texas courts must be required to conduct the review and reconsideration required under the circumstances of Mr. Fierro's case.

#### 1. Under the President's Determination, Texas Is Required to Provide the Review and Reconsideration Mandated by the *Avena* Judgment in Mr. Fierro's Case

In a brief filed on behalf of the United States in the United States Supreme Court on the day the President's determination was issued, the Solicitor General of the United States explained that each Mexican national subject to the *Avena* judgment has a right to receive the full review and reconsideration ordered by the International Court of Justice. *See* Brief for the

23

United States as Amicus Curiae, Feb. 28, 2005, 2005 WL 504490, at 38-48, *Medellín v. Dretke* (U.S.) (No. 04-5928) [Exhibit 10, attached hereto]. The United States explained that, by the terms of a treaty duly ratified by the President with the advice and consent of the Senate, the ICJ decision places the United States "under an international obligation to choose a means for 51 individuals to receive review and reconsideration of their convictions and sentences to determine whether the denial of the Article 36 rights identified by the ICJ caused actual prejudice to the defense either at trial or at sentencing." *Id.* at 40. Accordingly, the Mexican nationals covered by *Avena* may "file a petition in state court seeking such review and reconsideration, and the state courts are to recognize the *Avena* decision. In other words, when such an individual applies for relief to a state court with jurisdiction over his case, the *Avena* decision should be given effect by the state court in accordance with the President's determination that the decision should be enforced under general principles of comity." *Id.* at 42. In the event that prejudice is found, "a new trial or a new sentencing would be ordered." *Id.* at 47.

To the extent that state procedural default rules would prevent giving effect to the President's determination, "those rules must give way, because Executive action that is undertaken pursuant to the President's authority under Article II of the Constitution and authorized by his power to represent the United States in the United Nations, *see* U.N. Charter Art. 94, constitutes 'the supreme Law of the Land.' U.S. Const., Art. VI, cl. 2." *Id.* at 43-44. As the United States explained, "the [Supreme] Court has repeatedly held that the President has authority to make executive agreements with other countries to settle claims without ratification by the Senate or approval by Congress. *American Insurance Association v. Garamendi*, 539 U.S. 396, 415 (2003); *Dames & Moore v. Regan*, 453 U.S. at 679, 682-683; *United States v. Pink*, 315 U.S. 203, 223 (1942); *United States v. Belmont*, 301 U.S. 324, 330-331 (1937). The Court

has also held that such agreements preempt conflicting state law. *Garamendi*, 539 U.S. at 416-417; *Pink*, 315 U.S. at 223, 230-231; *Belmont*, 301 U.S. at 327, 331." *Id.* at 45.

A determination is a form of presidential directive equivalent to an Executive Order. "[I]t is the substance of a President's determination or directive that is controlling and not whether the document is styled in a particular manner." Dep't of Justice, Office of Legal Counsel, *Legal Effectiveness of a Presidential Directive, As Compared to an Executive Order* (Jan. 20, 2000) (Memorandum for the Counsel to the President). *See* www.usdoj.gov/olc/predirective.htm. As such, it has the force of law so long as "[t]he President's power ... to issue the order ... stem[s] either from an act of Congress or from the Constitution itself.'" *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *see Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-189 (1999); *see also Armstrong v. United States*, 80 U.S. 154, 156 (1871) (a President's proclamation on a matter entrusted to the executive is "a public act of which all courts of the United States are bound to take notice, and to which all courts are bound to give effect").

Because the President is the Head of State, U.S. Const., Art. II, § 2, cl. 2, & § 3, he is "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Thus, matters touching on foreign affairs are one of the core areas in which the President can act independently, and the laws of the States must yield to his authority. "[S]tate laws 'must give way if they impair the effective exercise of the Nation's foreign policy.'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 (2003), *quoting Zschernig v. Miller*, 389 U.S. 429, 440 (1968). *See also id.*, *quoting United States v. Pink*, 315 U.S. 203, 240 (1942) (Frankfurter, J., concurring) ("state law may not be allowed to 'interfere with the conduct of our foreign relations by the Executive'").

25

The President's power in the realm of foreign policy is limited only by "the Constitution's guarantees of individual rights." *Garamendi*, 539 U.S. at 417. Where, as here, the President has acted within the scope of that power in order to manage the Nation's foreign policy, fulfill its treaty obligations, and protect its citizens abroad, there can be no question of the constitutional validity of that action. That action requires contrary state laws to yield – just as the state laws were required to yield in *Garamendi*, *Zschernig* and *Pink*. Although the President's foreign policy actions and directives are not expressly listed as part of the supreme law of the land in Article VI, clause 2, of the United States Constitution, they share much the same status by virtue of the fact "that complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states." *United States v. Belmont*, 301 U.S. 324, 331 (1937). In addition, as the United States pointed out, a number of statutes authorize the President to take steps to implement the obligations of the United States in connection with its participation in the United Nations – of which the ICJ is the chief judicial organ – and to protect the rights of American nationals detained abroad, which may require the reciprocal protection of foreign nationals on American soil. *See, e.g.*, 22 U.S.C. § 287 (authorizing the President to appoint persons to represent the United States in the United Nations); 22 U.S.C. 287a (stating that persons appointed under § 287 "shall, at all times, act in accordance with the instructions of the President").

Accordingly, because of the President's determination, the State court was prohibited from applying the doctrines of procedural default that have previously operated to bar relief in the cases of foreign nationals seeking review of consular rights claims.

## 2. Even Without the President's Determination, the Vienna Convention, As Adjudicated in *Avena*, Is Directly Binding in Mr. Fierro's Case

Petitioner acknowledges that in *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006), the Supreme Court of the United States interpreted Article 36 not to preempt state procedural default rules, and thus reached a result different from the result reached by the ICJ in *Avena*. The Court in *Sanchez-Llamas*, however, did not decide whether the *Avena* judgment has binding effect – independent of whether it was a correct interpretation of the treaty on the merits – in the cases of the 51 Mexican nationals whose rights it adjudicated. The binding effect of a judgment is a matter entirely separate from its force as precedent or the merits of the underlying case: even an erroneous judgment can be enforceable and preclusive. As a matter of treaty and international law, the *Avena* judgment is binding on the United States in the case of the 51 Mexican nationals whose rights it adjudicated, and as a matter of the Supremacy Clause of Article VI of the United States Constitution, that treaty obligation must be given effect in both state and federal courts.

### a. By the Process Set Forth in the Constitution, the United States Voluntarily Agreed to the Vienna Convention and Its Optional Protocol

"Treaties are contracts between sovereigns." *Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir. 1996). Nations make treaties when they determine that the exchange of rights and obligations set forth in the treaty serves the best interests of their respective peoples. Because a treaty reflects a promise, the rule that treaties must be obeyed (*pacta sunt servanda*) "lies at the core of the law of international agreements and is perhaps the most important principle of international law." *Restatement (Third) of the Foreign Relations Law of the United States* § 321 cmt. a (1987) (hereinafter *Restatement (Third)); see also Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 433 (2d Cir. 2001). The rule says nothing more than that nations, no less than other contracting

27

parties, must keep their promises.

The United States Constitution places the power to make treaties in the hands of the democratically elected branches of the federal government. Specifically, Article II provides that the President "shall have Power ... to make Treaties." U.S. Const. art. II, § 2, cl. 2. That clause also provides, however, that the President may do so only "with the Advice and Consent of the Senate," and, for the Senate to grant consent, "two thirds of the Senators present [must] concur." *Id.* Hence, Congress cannot negotiate or enter into treaties, and the President cannot enter into them without Senate consent on a supermajority vote. This structure ensures that the United States takes on international obligations only with the clear support of the elected representatives of the American people. *See generally* Louis Henkin, *Foreign Affairs and the US Constitution* 36-37 (2d ed. 1996).

The United States followed this constitutionally prescribed process when it entered into the Vienna Convention on Consular Relations and its Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. United States delegates participated in the 1963 diplomatic conference that produced the Vienna Convention. *See* Report of the United States Delegation to the United Nations Conference on Consular Relations in Vienna, Austria March 4 to April 22, 1963, *reprinted in* S. Exec. Doc. E, 91st Cong., at 41 (1st Sess. 1969). The United States played an active role in drafting Article 36 of the Vienna Convention and the Optional Protocol. *See id.* at 59-61. Indeed, it was the United States that proposed the binding dispute settlement provision that became the Optional Protocol to the Vienna Convention, resisting efforts by other states to eliminate or weaken the dispute settlement provisions. *See id.* at 72-73.

The President signed the Vienna Convention and its Optional Protocol on April 24, 1963,

and sent it to the Senate on May 8, 1969. The Senate held hearings on October 7, 1969. It then unanimously consented to both the Vienna Convention and the Optional Protocol on October 22, 1969. *See* 115 Cong. Rec. 30997 (Oct. 22, 1969). Texas Senators Ralph Yarborough (D) and John G. Tower (R) joined in that unanimous vote. *Id.* The Supreme Court has explained that once a treaty is ratified, it is a law of the land as an act of Congress is, *whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined.* And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a *rule of decision* for the case before it as it would to a statute. *Head Money Cases*, 112 U.S. 580, 599 (1884) (emphasis added).

The treaty obligations reflected in the Vienna Convention and its accompanying Optional Protocol are entirely self-executing and required no implementing legislation to come into force. *Hearing Before the Senate Committee on Foreign Relations*, S. Exec. Rep. No. 91-9, 91st Cong. at 5 (1st Sess. 1969) (statement of J. Edward Lyerly, Deputy Legal Adviser for Administration, U.S. Dep't of State); *see also Restatement (Third)* § 111 (great weight accorded to Executive Branch statements in determining whether a treaty is self-executing); *see also Standt v. City of New York*, 153 F. Supp. 2d 417, 423 n.3. (S.D.N.Y. 2001); *United States v. Torres-Del Muro*, 58 F. Supp. 2d 931, 932 (C.D. Ill. 1999); *United States v. Chaparro-Alcantara*, 37 F. Supp. 2d 1122, 1124-25 (C.D. Ill.1999). Article 36 of the Vienna Convention, by its terms, confers rights on individual foreign nationals with respect to the requirements of consular notification and access, as the ICJ held in the *Avena* and *LaGrand* cases. *See* Vienna Convention art. 36(1)(b), 36(2); *Avena*, para. 40; *LaGrand*, para. 77. The Vienna Convention and its Optional Protocol are

now fully effective as United States law.[8]

> **b.**  **By Entering into the Vienna Convention and Its Optional Protocol, the United States Agreed to Submit Disputes Arising Under the Convention to the International Court of Justice for Binding Resolution**

The Vienna Convention on Consular Relations was designed to provide a comprehensive framework for the work of consular officials posted from one nation to another. In particular, Article 36 of the Vienna Convention requires that, when the authorities in a foreign state arrest or detain a citizen from one of the parties to the Vienna Convention, those authorities must advise the citizen without delay of his or her right to contact the consulate, notify the consulate without delay at the national's request, and allow the consulate to provide various forms of assistance. One need only imagine being detained in a foreign country to appreciate the importance of assuring foreign nationals that they can contact their consul and enlist the aid of their national government in, among other things, communicating with the local authorities, obtaining and assisting legal counsel, and contacting their families.

Not surprisingly, the Vienna Convention is among the most widely ratified multilateral treaties. An American arrested in China, or North Korea, or Colombia, or any of the other 168 nations that are party to the Vienna Convention has the right to be advised of his or her rights under the Convention and to seek and receive help from the U.S. consulate. As Judge Steven Schwebel, the United States Judge on the International Court of Justice, who was then serving as President of the Court, said in an earlier case involving the Vienna Convention, "the citizens of

---

[8] President Bush has announced that the United States would withdraw from the Vienna Convention's Optional Protocol submitting to the jurisdiction of the International Court of Justice to decide future disputes regarding the Convention. See Adam Liptak, *U.S. Says It Has Withdrawn From World Judicial Body*, N.Y. Times, Mar. 10, 2005. That withdrawal, however, has no impact on Mr. Fierro's case or the obligations in existence when his case was adjudicated by the ICJ.

no State have a higher interest in the observance of those obligations than the peripatetic citizens of the United States." *Vienna Convention on Consular Relations (Paraguay v. U.S.)* 1998 I.C.J. 248 (Provisional Measures Order of Apr. 9) (declaration of President Schwebel).

The Optional Protocol to the Vienna Convention provides that disputes "arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice." Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 24, 1963, 21 U.S.T. 325, 596 U.N.T.S. 487. In other words, by agreeing to the Optional Protocol, nations agree that any other nation that is party to the Optional Protocol can require them to submit disputes about the Vienna Convention to the International Court of Justice for binding resolution. As its name expressly states, entry into the Optional Protocol was optional for the United States. While 171 nations have agreed to the Vienna Convention, only 45 states have also agreed to the Optional Protocol. *See Status of Multilateral Treaties Deposited with the Secretary-General, at* http://untreaty.un.org/English/access.asp (last visited Nov. 17, 2006).

The binding character of a judgment of the International Court of Justice in a case within its compulsory jurisdiction is reinforced by the United Nations Charter, which is also a treaty that the United States entered by the standard constitutional process. U.N. Charter, Jun. 26, 1945, 59 Stat. 1031, T.S. 993, 3 Bevans 1153. The ICJ is the "principal judicial organ of the United Nations," and all Members of the United Nations, including Mexico and the United States, are *ipso facto* parties to the Statute of the Court. U.N. Charter, arts. 92, 93(1).

Article 59 of the ICJ's Statute provides that decisions of the ICJ are binding with respect to the parties to the particular case. Statute of the I.C.J., June 26, 1945, 59 Stat. 1055. The United States has frequently availed itself of the ICJ, initiating ten cases as an applicant or by

special agreement with another state. *See* International Court of Justice, *List of Cases brought before the Court since 1946, at* www.icj-cij.org (last visited Nov. 17, 2005). Indeed, the United States was the first state to invoke the Optional Protocol, when it brought an application against Iran concerning United States diplomatic and consular personnel who were being held hostage in Tehran in 1979. *See United States Diplomatic and Consular Staff in Tehran (U.S. v. Iran)*, 1979 I.C.J. 7; 1980 I.C.J. 3. By subscribing to the United Nations Charter, the United States agreed "to comply with the decision of the International Court of Justice in any case to which it is a party." U.N. Charter, art. 94(1). These provisions say no more than that, when nations are subject to the jurisdiction of a court – here, by virtue of their own consent to that jurisdiction – they, like any other parties before a court, must obey its orders and decisions.

Although the Supreme Court has recently advised that ICJ judgments are only generally entitled to "respectful consideration" as a matter of U.S. law, *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2683 (2006), the U.S. President is bound by the nation's international legal obligations to carry out its treaty commitments in good faith. After all, it is the President who promised to comply with ICJ judgments under the Optional Protocol and it is the President whose credibility is at stake when the United States fails to live up to the promises he made to the nation's treaty partners.

Because the President's determination and the *Avena* judgment are binding on the United States as a matter of treaty obligation, and hence are binding on Texas as a matter of federal law,[9] the judgment operates as a binding adjudication in Mr. Fierro's case. And the President

___

[9] As the United States Supreme Court has explained, the treaty component of the Supremacy Clause is necessary to the very concept of the United States as a unified, single nation:

A treaty cannot be the supreme law of the land, that is of all the United States, if any act of a State Legislature can stand it its way.... It is the declared will of the people of the United States that every treaty

has indicated that, in the case of Mr. Fierro and the other Mexican nationals who were express subjects of the *Avena* judgment, it should be treated as such.

As a legal matter, the President's determination and the *Avena* judgment operate in the same way as the judgment of a federal court on a federal question in a habeas proceeding. Hence, if any provision of the Texas Code of Criminal Procedure or any other Texas law prevented this Court from giving full effect to the *Avena* judgment and the President's corresponding decision to execute that Judgment in Mr. Fierro's case, that provision would be preempted by federal law.

### c. Under the *Avena* Judgment, Texas Is Prohibited From Applying Any Procedural Bar to Preclude Review and Reconsideration of Mr. Fierro's Conviction and Sentence

The *Avena* judgment determined that Texas authorities violated Mr. Fierro's Vienna Convention rights and that as a remedy, he is entitled to judicial review and reconsideration of his conviction and sentence in light of the possible prejudice caused by the Article 36 violation on its own terms. The International Court of Justice found that, in the case of Mr. Fierro, invocation of procedural default rules have precluded, and continue to preclude, the required judicial review and reconsideration of his conviction and sentence. *Avena*, ¶¶ 112-14. In so holding, the ICJ reaffirmed its earlier decision in the *LaGrand Case (Germany v. U.S.)*, 2001 I.C.J. 466, ¶ 90, which found that application of procedural default rules violates Article 36 of the Vienna Convention if, as applied in a particular case, they prevent a foreign national from challenging his conviction and sentence on the grounds of a prior violation of Article 36.

---

made, by the authority of the United States, shall be superior to the Constitution and laws of any individual state; and their will alone is to decide.

*Ware v. Hylton*, 3 U.S. 199, 236-37, 1 L. Ed. 568, 584 (1796).

**B.**   **Mr. Fierro Has Shown Sufficient Prejudice from the Denial of His Vienna Convention Rights to Require the Texas Courts to Adjudicate His Claim**

As a remedy for the violation of Mr. Fierro's Vienna Convention rights, the International Court of Justice ordered that the United States "provide, by means of its own choosing, review and reconsideration of the convictions and sentences of [among others, Mr. Fierro], by taking account ... of the violation of the rights set forth" in the Vienna Convention. *Avena* at ¶ 153(9). "[T]his freedom in the choice of means for such review and reconsideration[, however,] is not without qualification." *Id.* at ¶ 31. The review and reconsideration of Mr. Fierro's conviction and sentence must be "effective" and "'tak[e] account of the violation of the rights set forth in [the] Convention' and guarantee that the violation and the possible prejudice caused by that violation will be fully examined...." *Id.* at ¶ 138 (citations omitted).

Significantly, the Court held that the violation of Mr. Fierro's Article 36 rights must be addressed on its own terms, not under the rubric of other due process rights afforded in the United States criminal justice system. *Id.* at ¶ 139. As the Court explained, "The rights guaranteed under the Vienna Convention are treaty rights which the United States has undertaken to comply with in relation to the individual concerned, irrespective of the due process rights under United States constitutional law." *Id.*

The obligations established by the *Avena* Judgment may be met under Texas law by granting Mr. Fierro an evidentiary hearing to determine the extent of the prejudice resulting from the Article 36 violation.

**1.**   **The Violation of the Vienna Convention Caused Mr. Fierro Substantial Prejudice That Demands A New Trial**

The International Court of Justice has called upon the courts of the United States to assess the consequences of the undisputed violation of the Vienna Convention in Mr. Fierro's

34

case. Fortunately, domestic courts are not without guidance on how to evaluate such a claim. The United States Supreme Court has suggested that any claim under the Vienna Convention is subject to a prejudice requirement. *Breard v. Greene,* 523 U.S. 371, 377 (1998) (*dicta* suggesting that petitioner may only be entitled to relief for Vienna Convention violation where violation had "some effect" on the fairness of the trial). Courts considering Vienna Convention claims have developed a three prong test for determining if a prisoner has demonstrated prejudice: "(1) the defendant did not know he had a right to contact his consulate for assistance; (2) he would have availed himself of the right had he known of it: and (3) it was likely that the consulate would have assisted the defendant." *Torres v. Oklahoma*, No. PCD-04-442, at 9 (citations omitted) (Chapel, J., concurring) [Exhibit 11, attached hereto]. *See also United States v. Rangel-Gonzalez,* 617 F.2d 529, 533 (9th Cir. 1980) (same test, applied to the failure of INS officials to advise detainees of their right to consular notification and consultation in connection with deportation proceedings). Mr. Fierro easily satisfies this burden.

### a. Mr. Fierro Did Not Know He Had a Right to Contact His Consulate for Assistance

Mr. Fierro did not know, nor did anyone attempt to inform him of, his right to consular assistance. Exhibit 6, Affidavit of Cesar Fierro, at ¶ 4. Throughout all previous forums, in U.S. Courts and in the International Court of Justice, the State has never contested the fact that Mr. Fierro was not informed of his rights under the Vienna Convention, nor has it ever suggested that he had independent knowledge of his rights. There can be no credible debate as to whether Mr. Fierro has satisfied this first element of the test.

### b. Mr. Fierro Would Have Contacted The Mexican Consulate Had He Been Apprised of His Rights

Had Mr. Fierro been properly informed of his right to consular notification upon arrest or

at any time during his pre-trial detention, he would have sought the consulate's help. Exhibit 6, at ¶ 5. There was no reason why Mr. Fierro would have hesitated to apprise the Mexican consulate of his situation; quite the reverse, in fact. Mr. Fierro's ties to Mexico and his native culture were deep and enduring. He is a Mexican citizen and has "never renounced [his] citizenship." *Id.* at ¶ 2. His parents lived in Mexico. Moreover, he had powerful reasons to seek the help of consular officials after his arrest. He was deeply worried when Detective Medrano and Commandante Palacios told him, during Medrano's interrogation of Fierro, that his family had been taken into custody by the Juarez police. *Id.* at 5. He "wanted [his] family out of jail" and "wanted to know to know that the police were not going to torture them." *Id.* In addition, he needed consular officials "to help me understand my rights under American law," because "the American criminal justice system was strange to me." *Id.*

There is nothing on the record in this case to support a finding that Mr. Fierro would not have immediately invoked his right to consular notification. Furthermore, the State may not speculate that Mr. Fierro would not have availed himself of the right based upon generalized comparisons to other foreign nationals. *See United States v. Rangel Gonzales*, 617 F.2d at 532 (*citing Missouri ex rel. Gaines v. Canada*, 305 U.S. 338, 350-51 (1938)) ("The right established by [the INS regulation affording the right to consular notification] and in this case by treaty is a personal one.... The effect of its violation on one individual cannot be measured by the effect of its violation on others. Personal rights cannot be abrogated simply because others do not exercise them.").

c. **Mexico Would Have Provided Substantial Assistance to Mr. Fierro**

At least one court has already recognized the "significance and importance" of the

36

assistance provided by Mexican consular officials to Mexican citizens facing capital charges in the United States. *See Valdez v. State*, 46 P.3d 703, 710 (Okla.Crim.App. 2002) (holding that trial counsel provided ineffective assistance in failing to inform Valdez of right to contact the Mexican consulate). In the case of Mr. Valdez, the Oklahoma Court of Criminal Appeals found that "the Government of Mexico *would have* intervened in the case, assisted with Petitioner's defense, and provided resources to ensure that he received a fair trial and sentencing hearing." *Id.* (emphasis added). Indeed, in numerous cases where Mexican consular officials have been contacted by Mexican citizens facing capital charges in the United States, consular officials have provided significant material support and assistance in the defense of those citizens. *See, e.g.,* Exhibit 11 (Affidavit of Scott J. Atlas) (declaring that in the case of Ricardo Aldape Guerra, the consulate's assistance in the defense quite literally made the difference between life and death); Exhibit 12 (Declaration of Michael Iaria) (describing assistance provided by Mexican government to national facing capital charges in Oregon which resulted, among other things, in the withdrawal of incompetent counsel and the appointment of a qualified capital defense attorney); Exhibit 13 (Affidavit of Bonnie Goldstein) (describing assistance provided by Mexico during the 1992-1997 period to Mexican nationals on Texas death row in habeas proceedings); Exhibit 14 (Declaration of Peter Lopez) (describing investigative assistance obtained through Mexican consular officials that led to dismissal of pending capital charges because of the client's innocence). It is apparent that this kind of assistance has been available through Mexican consular officials for at least the last four decades. *See* Exhibit 15 (Affidavit of Everard Kidder Meade) (tracing the history of Mexico's active interest in and support for Mexican citizens facing capital proceedings in the United States from 1920 forward).

When Mexican consular officials were apprised in the early 1990's of the details

concerning the coercion of Mr. Fierro's confession, consular officials and the Attorney General of Fierro's home state in Mexico made clear that they would have provided critical assistance had Fierro contacted them at the time he first became concerned about his family's detention by the police in Juarez. Exhibits 7 and 8. They would have learned whether Fierro's family was actually being detained illegally, would have taken the steps necessary to secure the release of his family members, and would have informed Fierro of their actions, *id.* – thus removing the very concern that the Texas courts later found, in state habeas proceedings in the mid-1990s, gave El Paso police the power to coerce a confession from Mr. Fierro.

Thus, it is apparent that consular assistance would have eliminated the factors that led to Mr. Fierro's coercion-induced confession. In these circumstances, it is self-evident that had Fierro been advised of his right to consular notification and consultation, there is "a likelihood that the contact would have resulted in assistance to him...." *United States v. Rangel-Gonzales,* 617 F.2d at 533.

### 2. Under the Court of Criminal Appeals' 1996 Decision in Fierro's Case, It Is Apparent That The Violation of the Vienna Convention Caused Fierro the Kind of Prejudice That Demands A New Trial

In *Ex parte Fierro*, 934 S.W.2d 370 (Tex.Crim.App. 1996), the Court held that the admission of Mr. Fierro's coerced confession established sufficient prejudice to require a new trial under the test of *Chapman v. California*, 386 U.S. 18 (1967). 934 S.W.2d at 376 ("[w]e agree that the applicant has met the *Chapman* standard"). That standard is the equivalent of the standard articulated in *United States v. Bagley*, 473 U.S. 667, 678-79 (1985), for gauging the harm of the knowing use of false testimony: whether there is a "'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" (Quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976)). *Bagley,* 473 U.S. at 679-80 n. 9. The focus, accordingly, is whether

38